546

HOT SPRINGS STREET RAILWAY COMPANY, INC. *v.* ROSS.

5-164                                                    261 S. W. 2d 789

Opinion delivered November 2, 1953.

*House, Moses & Holmes, Thomas C. Trimble, Jr.,* and *Charles J. Lincoln,* for appellant.

*Earl J. Lane, Michael B. Heindl* and *Mallory & Carlisle,* for appellee.

J. SEABORN HOLT, J.   August 22, 1952, appellee, Onetha Ross, filed suit to recover damages, alleged to have

been received when she fell in the aisle of appellant's bus because of appellant's negligence in operating the bus. Appellant answered with a general denial and affirmatively pleaded as a defense contributory negligence of appellee and "the defendant's employee, driver of defendant's bus, was forced to make an unscheduled stop at the intersection of Ouachita Avenue and Central Avenue . . ., as the only means of avoiding an accident with another vehicle, which other vehicle's actions were without the control of the defendant or its employee; said stop was necessitated by defendant's employee acting in an emergency to avoid a catastrophe." A jury awarded appellee $3,000 and no complaint is made that this verdict is excessive.

Appellant earnestly insists, however, that there was no substantial evidence to warrant any recovery and "that considering the evidence in the light most favorable to the appellee, there is no question but what the operator of the bus in stopping it at the time the appellee fell and received her injuries, was acting in an emergency and was attempting to avoid a collision which could have resulted in extensive injuries and damages to the lives and property of his passengers and others."

At about 4:20 P.M., February 14, 1952, appellee boarded appellant's bus on the Como Hotel corner on Ouachita Ave. in Hot Springs, without incident. She was the only person to board the bus at that point. While holding to an upright post just behind the driver, she paid her fare, procured a transfer, and while still holding to the post, the driver started the bus in motion, throwing appellee off balance. Some seven or eight other passengers on the bus at the time were all in their seats. She stumbled forward in an effort to secure a seat in the rear of the bus, and on account of the quick take-off and speed of the bus which "was going unusually fast," she had to strain forward, holding on from seat to seat, as she proceeded. She testified: "Q. And about how many steps did you take, Onetha? A. About three or four, I just got about half way of the bus. Q. What caused you to fall? A. A sudden stop of the bus. Q. What kind of a stop

was it? A. He stopped, I thought he stopped—the distance that he drove the red light, I thought, well, it just caught him, but I couldn't tell positive. Q. Well, what kind of a stop was it? A. It was just a sudden stop. . . . Q. And what happened after that? A. That gave me a sling and I commenced stepping backwards, and when I fell my head was right up where he could look down on me.'' Appellee fell on her back with such force that her back was broken in two places and a bone just above the elbow was badly fractured, pronounced by a doctor as a ''badly shattered fracture.'' Appellee spent thirty-three days in a hospital.

Other witnesses tended to corroborate appellee. Georgia Dunwood testified: ''A. Well, when the bus stopped, it usually stopped there at the Como, why she walked in like me or you or anyone, she just walked in, she dropped her money in over there where you register, then she stood waiting for her transfer and he gave her the transfer and so he just pulled right off, and so she turned around and when she turned around while he was pulling off that just gave her a stumble you know, to make a step and she did make a step, the first seat running this way and the seat running this way there at the corner, and when she got there she fell back, and then when he made that jerk why she just fell back and went right back under him. Q. What kind of a jerk was it, Georgia? A. Well, he got on the brakes I guess, he must have just checked up like that— Q. Well, when the bus driver jerked like that, how did you react? A. I, all the rest of us—all of us kind of jerked. All together like that, we all jerked. Q. Everybody jerked, even the people sitting down, is that right? A: Yes, give us all a jerk. Q. You saw Onetha fall? A. Yes, sir. I saw her fall.'' She was seated at the time in the rear of the bus and saw another car ''right in front of the bus'' going in the same direction.

While there was evidence on behalf of appellant, denying that there was any negligence in the sudden stopping of the bus, we hold that the above testimony was

sufficient to support the jury's verdict under our well established rules in actions of this nature.

In *Capital Transportation Company* v. *Howard*, 217 Ark. 333, 229 S. W. 2d 998, we announced the rule in this language: "Before appellee would be entitled to recover, the burden was on her to show, by some substantial testimony, that her fall and consequent injuries resulted from a violent or an unusual jerk, amounting to negligence on the part of appellant in operating its bus. We so held, in effect, in such cases as *St. Louis-San Francisco Railway Co.* v. *Porter*, 199 Ark. 133, 134 S. W. 2d 546; *Missouri Pacific Railroad Company* v. *Baum*, 196 Ark. 237, 117 S. W. 2d 31, and *Missouri Pacific Transportation Co.* v. *Bell*, 197 Ark. 250, 122 S. W. 2d 958.

.    .    .    .    .    .    .    .

"The same standard of care is required in the operation of trains, buses, street cars and trolley buses. Our rule is well settled that we must affirm where there appears any substantial evidence to support the jury's verdict. It is also our duty to view the evidence in the light most favorable to the appellee, giving to it, its strongest probative value, in her favor, with every reasonable inference deducible from it, whether from all the evidence presented or from appellee's testimony only. *Harmon* v. *Ward*, 202 Ark. 54, 149 S. W. 2d 575, and *St. Louis Southwestern Railway Company* v. *Holwerk*, 204 Ark. 587, 163 S. W. 2d 175", and in *Pugh* v. *Camp*, 213 Ark. 282, 210 S. W. 2d 120, we said:

"It is well settled that a verdict should be directed against a party only when there is no evidence tending to establish an issue in his favor, when viewed in the most favorable light to him. *Barrentine* v. *Henry Wrape Co.*, 120 Ark. 206, 179 S. W. 328. Or, stating it another way, 'If there is any evidence tending to establish an issue in favor of a party, it is error to direct a verdict against him.' Headnote 1, *Scott* v. *Wisconsin & Ark. Lbr. Co.*, 148 Ark. 66, 229 S. W. 720."

The many cases relied upon by appellant to support its contention that it was entitled to a directed verdict

are all, we think, distinguishable on the facts peculiar to each.

Among those cases is the above case of *Capital Transportation Company* v. *Howard,* one of our most recent cases. In that case, the plaintiff alleged that she was caused to fall in the rear of a bus just before reaching her seat when there was a sudden jerk or "snatch" of the bus, causing her to fall to the floor and injuring her. We there said that no witness "testified that there was a violent or unusual jerk, . . ." and "it is highly significant that appellee was the only passenger on the bus, wherein other passengers were standing, to receive a fall or injury, and made no complaint to the bus driver."

As indicated, in the present case, all passengers were seated at the time that appellee fell and it appears that all noticed and received a sudden jerk of the bus. Appellee, the only one standing, was thrown so violently on her back on the floor of the bus, within a few feet of the bus driver, that she suffered a broken back, a badly shattered fracture of the bone above the right elbow and was so painfully and seriously injured as to require hospitalization for thirty-three days.

We now consider appellant's defense that its driver's sudden stop of the bus was without fault on his part and an act of emergency, in the circumstances. We hold that whether the bus driver was confronted with such an emergency, which would absolve appellant from liability, would depend upon whether the bus driver was himself free of any negligence in creating the emergency. This presented a jury question. The general rule, which is in accord with our own, is stated in *138 A. L. R.,* p. 229, (b) in this language: "The inference of negligence on the part of the operator of a motor vehicle that arises from evidence of a violent and unusual jerk or jolt of the vehicle may be rebutted by proof that a sudden stop or turn was necessary to avoid a collision or some other unexpected emergency. . . . However, the defense of sudden emergency is not available unless the party who invokes it is himself free from fault in creating the emergency."

Appellant offered evidence that the driver stopped suddenly in an effort to avoid colliding with an automobile that was entering the street intersection from his right and thus avoid injury to his passengers and to others. On this point, the bus driver (Scott) gave this version: "Q. When did you first see that car? A. Well, just a second or two, I guess before it turned there, because I wasn't expecting a car coming from there because I had a green light and they were supposed to stop on a red light. Q. How fast would you say the car was going? A. Oh, I'd say around 15 miles an hour, maybe. . . . Q. When did you first notice this other car that you state turned in front of you? A. Oh, just a second or two before I stopped. Q. You didn't notice the car before that? A. I noticed the car on the other street, but I didn't notice this particular one. Q. How far did you miss that car? A. I'll say just a couple of feet, maybe."

In the circumstances, it was for the jury to say whether Scott was keeping a proper lookout to his right for traffic. He appears to make no claim of obstructed view and admitted that the car in question was going slowly, about 15 miles per hour. The jury may have found from all of the evidence that Scott was looking straight ahead and driving unusually fast in order to beat a red light. In a situation somewhat similar, we said in *Missouri Pacific Transportation Company* v. *Mitchell*, 199 Ark. 1045, 137 S. W. 2d 242: "The jury may have concluded from this evidence that C. W. Raines (carrier's bus driver) was traveling at an unreasonably dangerous rate of speed and was the author of the jam or emergency he claimed to have gotten into. One cannot negligently create a dangerous situation and escape liability on the theory that he acted as he did under the impulse of the moment."

Affirmed.